UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WENDY KAY VIDETIC**,                          Case No. 1:10 CV 2196

         Plaintiff,                          Judge Donald C. Nugent

    v.                          REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

         Defendant.                          Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Wendy Kay Videtic appeals the administrative denial of Disability Insurance Benefits (DIB) under 42 U.S.C. § 405. The district court has jurisdiction over this case under 42 U.S.C. § 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons given below, the Court recommends the Commissioner's decision denying benefits be affirmed.

### BACKGROUND

Plaintiff applied for DIB on March 7, 2007, alleging a disability onset date of November 1, 2003. (Tr. 75). Her claim was denied initially and upon reconsideration. (Tr. 53, 59). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr.66). Born in 1949, Plaintiff was 60 years old at the time of the ALJ's hearing. (Tr. 26).

Medical History

Plaintiff's predominant medical complaint has been problems with her legs, allegedly making her unable to walk, as well as consistent back pain. (Tr. 94, 118, 121, 307–339). She has been

prescribed medication for depression, but reported to the SSA that her depression was situational and related to her health, finances, and inability to work. (Tr. 101). Because of her pain, Plaintiff described her typical day in documents submitted to the SSA: "Take a bath, eat breakfast, do light house work, watch TV, help with dinner, watch TV[,] go to bed." (Tr. 114). She also reported her back and leg pain disturb her sleep. (Tr. 114).

Plaintiff's primary care physician, Michael Hackett, M.D., treated her for thyroid problems beginning before her alleged onset date. (Tr. 140–144). Dr. Hackett's notes from Plaintiff's initial visit with her in 1997 indicate Plaintiff was diagnosed with hypothyroidism around 1987. (Tr. 144). Relevant to these proceedings, Plaintiff returned to Dr. Hackett for a hypertension follow-up in April 2006. (Tr. 163). At that time, she complained of anxiety and continuing bone and joint pain. (Tr. 163). Dr. Hackett reported her hypertension was well-controlled by medication. (Tr. 163–164). Dr. Hackett also decreased her hypothyroid medication. (Tr. 166). At a follow up in July 2006, Dr. Hackett's medical assistant noted new reports of daily pain in Plaintiff's right side, but indicated it was a "0 on a scale of 0–10", and more like numbness. (Tr. 167).

In January 2007, Plaintiff reported feeling okay at a follow-up with Dr. Hackett. (Tr. 175). However, Dr. Hackett wrote "both legs hurt her – right leg is the worse – awakens her in the night." (Tr. 175). On examination, he found Plaintiff's right knee was tender and felt slightly larger, "as though with arthritic deformity." (Tr. 176). Once again, visit notes made by Dr. Hackett's assistant reported Plaintiff complained of a new, this time severe, pain in her leg. (Tr. 177). Dr. Hackett then referred Plaintiff to orthopedic surgeon Dan Single, M.D. (Tr. 179).

Plaintiff was seen by Dr. Single in February 2007, at which time Dr. Single ordered x-rays and conducted a physical examination. (Tr. 181–182). He noticed "some right knee laxity with

2

Lachman examination" and remarked that it was "somewhat peculiar" Plaintiff complained of significant pain while lying flat. (Tr. 182). The exam was negative for any type of lumbosacral radiculopathy. (Tr. 182). Noting his concern of a possible ACL tear, Dr. Single ordered an MRI of Plaintiff's right knee "to rule out any internal derangement". (Tr. 182). The principal interpreter for this MRI, Naveen Subhas, M.D., reported completely normal findings, with all menisuses intact and within normal limits for Plaintiff's age. (Tr. 171). All of the ligaments in Plaintiff's knee were also shown to be intact, and the cartilage, bone marrow, and patellofemoral extensor mechanism were all within normal limits. (Tr. 171). The bony structures of Plaintiff's knee were reported "intact with no evidence of fracture or dislocation." (Tr. 172). Dr. Single made a point of noting in his records that Plaintiff's husband was concerned about her ability to work, requesting he fill out disability papers for her. (Tr. 182). He told her he was unsure of the diagnosis at that point, and would have to revisit the issue in the future. (Tr. 182).

On referral from Dr. Single, Plaintiff was seen by rheumatologist Augusto T. Hsia, M.D., in March 2007 for a second opinion of a possible lumbar pathology to explain her leg pain. (Tr. 184). On examination, Dr. Hsia reported normal findings, but noted Plaintiff walked with a slight limp right. (Tr. 185–186). He said he could not rule out a lumbar nerve impingement, and also suspected "a fibromyalgia component" to Plaintiff's pain. (Tr. 186). He ordered a lumbar MRI without contrast to rule out a nerve impingement or disc herniation. (Tr. 186).

Plaintiff underwent the lumbar MRI in April 2007, and it showed "degenerative changes most severe" at L5-S1. (Tr. 189). The physician interpreting the results, Todd Emch, M.D., reported normal findings at T12-L1, L1-L2, and L3-L4. (Tr. 169). Dr. Emch noticed a minimal bulging disc at L3-L4, and a bulging disc and arthropathy resulting in moderate to severe left neural foraminal

3

narrowing and moderate right neural foraminal narrowing at L5-S1. (Tr. 169, 189). Further electrodiagnostic examination showed "no evidence of a right lumbosacral radiculopathy" or nerve impingement. (Tr. 190). Dr. Hsia later wrote a letter in which he stated he had treated Plaintiff "for her diffuse aches [and] lumbar neuritis. She is going to need long term pain medication management." (Tr. 305).

Plaintiff was seen by Dr. Hackett in February 2008 to establish care after not seeing a doctor in at least six months. (Tr. 155). In his assessment, Dr. Hackett noted Plaintiff has hypothyroidism, joint pain in her knee, abnormal auditory function, myalgia, anxiety, and depressive disorder. (Tr. 155). Dr. Hackett ordered an x-ray of Plaintiff's knee, which showed a low-lying patella, but an "otherwise unremarkable" knee. (Tr. 146). He also recommended psychiatric care, which Plaintiff did not seek. (Tr. 156, 160, 163, 166).

From June 2008 to October 2009, Plaintiff frequently saw Thomas L. Craig III, M.D., for her back pain. (Tr. 307–339). She consistently reported to Dr. Craig that the pain radiated into both of her legs. (Tr. 307, 318, 322, 330, 332, 336). At one point during this course of treatment, in May 2009, Plaintiff began experiencing spasms in her back and legs. (Tr. 308, 314–315, 316–317). In August 2009, Plaintiff also reported knee and foot pain to Dr. Craig. (Tr. 310).  Dr. Craig maintained a diagnosis of osteoarthritis and lumbar strain or radiculopathy (Tr. 309, 311, 313, 319, 321, 323, 325, 329, 331, 333, 335), and kept Plaintiff on Percocet, Oxycontin, and Xanax to manage her pain (Tr. 307, 308, 311, 312, 314, 316, 318, 320, 322, 324, 326, 328, 330, 332, 334, 336, 338).

In September 2009, Plaintiff was seen by Susan A. Gifford, M.D., for stomach discomfort. (Tr. 354). Dr. Gifford reasoned Plaintiff's problems were stress-related, and recommended lifestyle modifications along with individual and marital counseling. (Tr. 355). She also prescribed Celexa

to help her anxiety and depression. (Tr. 355). Plaintiff followed-up with Dr. Hackett two weeks later, as instructed by Dr. Gifford, and complained of headaches. (Tr. 349, 355). At that time, Dr. Hackett referred her to dermatologist Jacob Dijkstra, M.D., because of a lesion on her right ear he described as a neoplasm of uncertain behavior. (Tr. 343, 350). A biopsy was conducted, and the pathologist concluded the lesion to be chondrodermatitis nodularis helicis. (Tr. 345, 348). Plaintiff was instructed to have it removed by laser if it did not resolve by itself in two months. (Tr. 343).

Meanwhile, Plaintiff underwent a CT scan of her brain with and without contrast to deduce the cause of her headaches because over the counter products were not relieving them. (Tr. 352, 359). The physician interpreting the scan, Parvez Masood, M.D., reported unremarkable, age-appropriate findings without evidence for acute pathology. (Tr. 353). The CT was deemed normal. (Tr. 353).

While seeking DIB, Plaintiff has had consultants evaluate her residual functional capacity (RFC) in light of both her physical and mental impairments. Medical consultant Anton Freihofner, M.D., conducted a physical RFC assessment in June 2007. (Tr. 233–239). He determined Plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, and stand, sit, or walk for about six hours in an eight-hour workday. (Tr. 233). He found no limitation in Plaintiff's ability to push or pull, and no manipulative, visual, communicative, or environmental limitations (Tr. 233–236). The only postural limitations Dr. Freihofner reported were being limited to occasional balancing or stopping. (Tr. 234). In his explanation, Dr. Freihofner said:

> [Plaintiff] alleges that she is unable to walk due to her lower extremity problems. However, the medical evidence indicates that [Plaintiff] ambulates with a normal gait, has normal sensation, pulses, and reflexes, and has functional ROM of the back and the LES. The clinical and objective findings are minimal. . . . [Plaintiff's] allegations are minimally credible. . . .

> The minimal clinical and objective findings indicate that [Plaintiff] is not well suited for heavy lifting. [H]owever, she is able to perform a medium level of physical activity without significant difficulty.

(Tr. 238, 240). This assessment was revisited in January 2008 by Willa Caldwell, M.D., and "affirmed as written" after reviewing all the evidence in the updated file. (Tr. 304).

Plaintiff has had multiple assessments of her psychological impairments. Plaintiff was first referred by the Bureau of Disability Determination to psychologist Herschel Pickholtz, Ed.D., whom she saw in January 2008 for a clinical interview and mental status evaluation. (Tr. 281). Dr. Pickholtz remarked that Plaintiff's overall behavior reflected a tendency to hold back, and that "at times she was presenting herself as depressed and other times she seemed to be exaggerating to some degree". (Tr. 283). Plaintiff told Dr. Pickholtz she had a history of anxiety and panic attacks, but became depressed after she lost her job and ran short of money. (Tr. 283–284). Dr. Pickholtz noted several facets of Plaintiff's life, such as caring for her hygiene on a daily basis, were inconsistent with major depression. (Tr. 285, 286).

Dr. Pickholtz came to the conclusion that Plaintiff could "work in a factory at low skilled and unskilled labor." (Tr. 286). He termed her personality as avoidant and dependent, and classified both her overall depression and anxiety as between mild and moderate. (Tr. 286). Assessing her mental RFC, Dr. Pickholtz reported a "mild range of impairment" in Plaintiff's ability to understand and follow instructions, to maintain attention to perform simple repetitive tasks, and to relate to others. (Tr. 286). He reported a "moderate range of impairment at worst" in Plaintiff's ability to withstand stresses and pressures associated with day to day work activities. (Tr. 286). Ultimately, Dr. Pickholtz was convinced Plaintiff "should be able to work . . . at no greater than the mild range of impairment with her major impediment [being] physical problems." (Tr. 286).

6

Also in January 2008, Plaintiff was evaluated by psychologist Bruce Goldsmith, Ph.D. (Tr. 290–302). He agreed she had "mild to moderate depression", anxiety, a mixed personality, and a specific phobia related to driving. (Tr. 293, 295, 297).  However, he concluded her impairments were not severe. (Tr. 290). Describing her functional limitations, Dr. Goldsmith reported no restrictions of daily living activities, no episodes of decompensation, and mild difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 300). He said, though her allegations are "mainly physical", she "appeared to be exaggerating statements and symptoms for effect" during his evaluation of her. (Tr. 302). "The totality of the evidence", he wrote, "does not support the existence of significant limitations due to a mental impairment." (Tr. 302).

Administrative Hearing

Plaintiff appeared with counsel at the hearing before the ALJ on January 8, 2010. (Tr. 21). Also appearing was Thomas Nimberger, a vocational expert (VE). (Tr. 21). Before testimony was taken, the ALJ noted Plaintiff's alleged onset date was the date she was laid off due to her plant closing. (Tr. 24). In response, Plaintiff's attorney stated, "There are no medical records to substantiate the disability in '03, '04, or '05. That was because after the plant closed, she did not have health insurance. We would be willing to amend the onset date to a later date. . . . February 8, '06." (Tr. 24–25). Plaintiff's testimony was consistent with this. (Tr. 40). Plaintiff said she discovered H-Care in 2006, which allowed her to get medical care without insurance at the Cleveland Clinic. (Tr. 40).

Plaintiff testified about her living situation. She said she lives with her husband and two grown children. (Tr. 25–26). Her two grandchildren, ages eleven and two, usually spend two days

7

a week at her house. (Tr. 38). Plaintiff babysits her granddaughter while her daughter is at school. (Tr. 39).

Plaintiff testified about her job history. She said she has no college or vocational certification of any kind. (Tr. 26). Before being laid off in 2003, Plaintiff worked at a Tomco Products factory for nineteen years, where she performed assembly work. (Tr. 26–27). At this job, she sometimes had to be on her feet for six hours a day, and had to occasionally lift about 50 pounds. (Tr. 27). After being laid off, she did not try to find another job. (Tr. 32). She said this was because her "leg was hurting too bad"; she felt she "just couldn't do it." (Tr. 33).

Plaintiff was asked extensively about her pain. She said every day she has pain in her back, in her hips, and down her legs. (Tr. 33). The pain lasts all day, but "some days it might be a little better than others." (Tr. 33). She takes pain medication to relieve the pain, which does help but makes her drowsy. (Tr. 34–35). Plaintiff was also asked about her depression, and said she used to take medication for it, but no longer does unless she is having a bad day. (Tr. 35).

Plaintiff testified about her RFC. She said her daughter does most of the household chores for her. (Tr. 35). When asked about particular things she is incapable of doing, Plaintiff said she cannot vacuum, scrub floors, put clothes in the washer or dryer, or load the dishwasher. (Tr. 35–36). She does take a turn preparing meals, and is capable of going to the grocery store, though usually with her daughter. (Tr. 36). She can drive herself. (Tr. 37). She said the longest she could be on her feet without having pain or discomfort is ten or fifteen minutes. (Tr. 41). Similarly, she said she can only sit for about 20 minutes before having pain or discomfort. (Tr. 42). She sometimes uses a walker in the house. (Tr. 41). She is able to dress and groom herself without assistance. (Tr. 42). She also said she falls sometimes getting out of bed in the morning because her leg gives out. Tr. 42).

8

Plaintiff said she would not be able to lift 50 pounds anymore. (Tr. 42). She also said she could not carry a bag of groceries in each hand from her car to her house. (Tr. 42). She could, however, carry ten pounds. (Tr. 42). She has stairs in her house, but goes up and down them "very little". (Tr. 42). When prompted by the ALJ, Plaintiff said bad weather makes her condition worse. (Tr. 43).

On a typical day, according to her testimony, Plaintiff gets up, eats breakfast, takes her medicine, then lies back down before getting back up to do a few dishes by hand. (Tr. 39). Once her back starts hurting from sitting down, she switches chairs. (Tr. 39). To pass the time, she reads magazines, listens to the radio, and watches television. (Tr. 40). She takes "a couple" naps every day for "an hour or two" apiece. (Tr. 43).

The VE was asked to describe Plaintiff's past work in terms of DOT characterizations. (Tr. 30–31). He labeled Plaintiff's assembly work as a bench assembler and classified it as light, unskilled work done at medium capacity. (Tr. 30–32). No further inquiry was made of the VE.

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474

9

F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a)(1)(E). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

On March 25, 2010, the ALJ issued a decision concluding Plaintiff was not under a disability from November 1, 2003 through December 31, 2008. (Tr. 9). December 31, 2008, the ALJ determined, was the last date Plaintiff met the insured status for DIB. (Tr. 11).

In his findings of fact, the ALJ said Plaintiff has the severe impairments of degenerative disc disease, osteoarthritis, and fibromyalgia. (Tr. 11). He also concluded Plaintiff does not have a severe mental impairment, after analyzing the paragraph B criteria of Listing 12.00C. (Tr. 11). With respect to listed impairments, the ALJ found Plaintiff does not have any impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404.1520(d), § 404.1525, or § 404.1526. (Tr. 12).

Plaintiff challenges the ALJ's decision for five reasons. Specifically, Plaintiff argues the ALJ erred by (1) disregarding the opinions of Plaintiff's treating physicians, (2) not finding Plaintiff's impairments to meet or equal Listing 1.04, (3) not compelling the attendance and testimony of a medical expert, (4) not propounding hypothetical questions about Plaintiff's RFC to the VE, and (5) not concluding Plaintiff was disabled under the Medical-Vocational Guidelines. (Doc. 8, at 5–14).

11

These arguments are dealt with in turn.

<u>Treating Physician Rule</u>

Plaintiff first argues the ALJ "seemingly gave no weight" to the opinions of Plaintiff's treating physicians, Drs. Hsia and Craig. (Doc. 8, at 7). She argues the ALJ failed not only to defer to these physicians, but also to state his reasons for the weight given them. This argument touches upon the treating physician rule.

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" – reasons "sufficiently specific to make clear . . . the weight [given] to the treating source's medical opinion and the reasons for that weight" – for discounting a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely*, 581 F.3d at 409–410 (6th Cir. 2009).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502.

12

A medical provider is not considered a treating source if the claimant's relationship with them is based solely on the claimant's need to obtain a report in support of their claim for disability. 20 C.F.R. § 404.1502.

Here, Dr. Craig is unquestionably a treating physician. He saw and treated Plaintiff for her back pain every single month for more than a year. (Tr. 307–339). But Dr. Craig never offered an opinion that the ALJ contradicted. In fact, Dr. Craig's notes are rather sparse. For each office visit, he generally wrote only his diagnoses, Plaintiff's present medications, and very short notes of her chief complaints, along the lines of "states that she continues to experience lower back pain [that] radiates into both legs" (Tr. 337), or "No specific complaints. Still with [illegible] back pain with radiation into legs" (Tr. 307), or "States that she has pain in both knees & feet" (Tr. 310), or "c/o back spasms c/o lumbar radiculopathy c/o leg spasms" (Tr. 314). The Court has carefully reviewed each of Dr. Craig's notes and has found no opinions rendered by him about Plaintiff's RFC. Instead, his notes comprise bare recitations of facts reported to him by Plaintiff, her medications, and his simple diagnoses. And his broad diagnoses of osteoarthritis, back pain, and lumbar radiculopathy (Tr. 311, 323, 325, 331, 335, 337, 339) were not given less than controlling weight by the ALJ, who incorporated these diagnoses into the severe impairments he found Plaintiff to have. (Tr. 11).

Dr. Hsia was also a treating physician. He saw Plaintiff on referral from Dr. Single in March 2007 in an effort to explain her leg pain. (Tr. 184). His records describe Plaintiff's pain somewhat thoroughly:

> The [l]eg pain is consta[nt], describe[d] as shooting, achy, worse with standing, walking. The pain is better with lying/sitting. The low back pain is intermittent, describe[d] as achy, worse household chores [sic]. Rates pain at 6/10 on average[.] . . .
>
> I have seen and treated [Plaintiff] for her diffuse aches, lumbar neuritis. She is going

13

to need long term pain medication management.

(Tr. 184, 305). Once again, though, Dr. Hsia was merely reciting how Plaintiff reported her pain. And needing pain medication management does not necessarily preclude an individual from having an RFC that allows for light work as defined by 20 C.F.R. § 404.1567(b). Furthermore, while Drs. Hsia and Craig both documented chronic pain, they did not report pain of disabling severity. If anything, Dr. Hsia's notes indicate Plaintiff has an RFC consistent with the ALJ's determination. After examination, he reported full extension in Plaintiff's hips, no instability in Plaintiff's knees with a full range of motion, a negative straight-leg raising test, a negative posterior drawer test, no pain with patellar compression, and no effusion, redness, warmth, lumps, bumps, or masses. (Tr. 181–182). He reported normal X-rays and said he saw "no significant arthritic changes, fractures, dislocations, osteolytic or osteoblastic lesions." (Tr. 182). In fact, the only concern Dr. Hsia had after examining Plaintiff was for a possible ACL tear, but a subsequent MRI showed no such tear and was reported as a "normal MRI right knee". (Tr. 182, 183). In sum, Dr. Hsia's findings were given controlling weight by the ALJ, who explicitly recognized Plaintiff suffers from chronic pain but imaging of her legs has produced normal results. (Tr. 14).

Plaintiff argues treating physicians' notes repeatedly referenced her decreased range of motion, pain, and spasms. But the ALJ's findings were not inconsistent with this evidence. The ALJ determined Plaintiff has the severe impairments of degenerative disc disease, osteoarthritis, and fibromyalgia. (Tr. 11). This is actually a rather liberal construction of Plaintiff's treating physicians' opinions, given that in all of her treatment records the word "fibromyalgia" appears only once, and only in the context of a suspicion by Dr. Hsia. (Tr. 186). Rather, the ALJ took the reports of Drs. Craig and Hsia and incorporated their findings into his decision. Plus, the fact that neither doctor

14

made detailed RFC findings allowed the ALJ to rely heavily on consultant RFC assessments. *See Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 294 (6th Cir. 2006) ("[N]one of [plaintiff's] doctors . . . made detailed functional capacity analyses, which leaves the functional capacity forms from the medical reviewers as the best evidence."). Ultimately, the ALJ did not err in his treatment of Plaintiff's treating physicians.

Listing 1.04

Plaintiff argues the ALJ erred by stating Plaintiff did not meet Listing 1.04 as "a bald conclusion", without more explanation. (Doc. 8, at 9). Indeed, the ALJ found Plaintiff "did not have an impairment that met or medically equaled one of the listed impairments", without giving specific explanation. (Tr. 12). But given the record evidence, the ALJ did not need to. For a claimant to show her impairment matches a listing, she must prove her impairment satisfies all of the listing's specified medical criteria. 20 C.F.R. § 404.1525(d); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). This is not the case here.

Listing 1.04 describes a kind of musculoskeletal impairment:

Disorders of the spine (e.g., herniated nucleus puporous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

15

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. 404, Subpt. P., App. 1, § 1.04. On review, the ALJ's conclusion – that Plaintiff's impairments do not equal Listing 1.04 – is fully supported by substantial evidence in the record. While there is evidence Plaintiff has a spinal disorder resulting in compromise of a nerve root or the spinal cord (Tr. 189), the record shows Plaintiff does not satisfy paragraph A, B, or C of the listing.

To show nerve root compression, paragraph A requires neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory loss or reflex loss, *and* positive straight-leg raising tests if there is involvement of the lower back. While there is medical evidence in the record showing pain distribution to her legs (Tr. 307, 318, 322, 330, 332, 336) and a slight limitation of motion of her spine (Tr. 185–186), there is no evidence of motor loss accompanied by sensory or reflex loss. In actuality, Dr. Hsia reported all of Plaintiff's extremity reflexes and strength to be "within normal limits". (Tr. 186). Dr. Hackett also said she had symmetrical reflexes and "[n]o involuntary motions." (Tr. 155). And there are no reports in the record of sensory loss. Dr. Freihofner's RFC assessment was consistent with all of this, reciting that the medical evidence showed Plaintiff has "normal sensation, pulses, and reflexes, and has functional ROM of the back and the LES." (Tr. 237). Furthermore, the record indicates Plaintiff's lower back is involved because an MRI showed narrowing at L5-S1 (Tr. 189), but there are no positive straight-leg raising tests reported. In fact, Plaintiff had two negative straight-leg raising tests reported, one by Dr. Single in February 2007 (Tr. 181), and one by Dr. Hsia in March 2007 (Tr. 186). Therefore, substantial evidence in the record shows Plaintiff cannot meet the paragraph A criteria.

Paragraph B requires an operative note, pathology report of a biopsy, or medically

16

appropriate imaging to confirm spinal arachnoiditis. Plaintiff has not argued meeting this criteria, and no evidence in the record suggests Plaintiff has spinal arachnoiditis. Similarly, no record evidence reports Plaintiff having a severe burning or painful dysesthesia. With no such medical evidence, these criteria need not be considered. *See* 42 U.S.C. § 423(d)(5)(A).

As for paragraph C – requiring lumbar spinal stenosis that results in pseudoclaudication and is "established by findings on appropriate medically acceptable imaging" – Plaintiff's imaging has suggested such an impairment, though Plaintiff can still ambulate effectively. Plaintiff's one lumbar MRI in the record was reported to show "moderate to severe left foraminal narrowing and moderate right neural foraminal narrowing" at L5-S1. (Tr. 189). Because when describing the image of every other vertebrae, Dr. Emch reported "no significant central canal or neural foraminal stenosis", his notes for L5-S1 appear to describe lumbar spinal stenosis seen through medically acceptable imaging.[1] This would be consistent with Dr. Craig's diagnosis of lumbar stenosis. (Tr. 339). Similarly, Plaintiff's medical records show chronic pain and perhaps even pseudoclaudication.[2] (Tr. 309–339).

Critically, paragraph C still requires an inability to ambulate effectively. The regulations define this concept:

> Inability to ambulate effectively means an extreme limitation of the ability to walk,

---

1. The Court is not a medical expert, and is in no position to determine whether "foraminal narrowing" at L5-S1 equates to lumbar spinal stenosis. Plaintiff argues medical expert testimony was necessary on this point, and under other circumstances, she would be correct. But because Plaintiff cannot meet the rest of the paragraph C criteria, medical expert testimony is unnecessary.

2. Once again, the Court is not in a position to judge whether Plaintiff's records actually show pseudoclaudication when her physicians never specifically used that word. But this is not determinative here, as the Court can assume pseudoclaudication was shown and still determine Plaintiff fails to meet the paragraph C criteria. See above.

> i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. 404, Subpt. P, App. 1, § 1.00B2b(1). Here, there is substantial evidence in the record that shows Plaintiff's ability to walk, though somewhat restricted, is not *extremely* limited. Not only is there no medical evidence of an extreme limitation on Plaintiff's ability to walk, but records from her treating physicians show her ambulation is only slightly limited. Dr. Hackett reported a "[n]ormal gait" in February 2006. (Tr. 155). Dr. Single reported "*some* pain and stiffness when getting up and walking. . . . She walks with an antalgic gait on the right-hand side but not the left." (Tr. 210, emphasis added). Similarly, Dr. Hsia reported a "gait with *slight* limp right, able to toe and heel walk." (Tr. 186, emphasis added). Furthermore, Dr. Freihofner's RFC assessment concluded Plaintiff "ambulates with a normal gait". (Tr. 237). This assessment was later affirmed by a different consultant, Dr. Caldwell, who reviewed updated medical records. (Tr.304). Also, even though Plaintiff testified she sometimes uses a walker to get around the house (Tr. 41), the regulations state "[t]he medical basis for the use of any assistive device (e.g., instability, weakness) should be documented", and there is no medical documentation in the record of Plaintiff needing a walker or other assistive device. *See* 20 C.F.R. 404, Subpt. P, App. 1, § 1.00J4. Thus, even though Plaintiff's medically acceptable imaging likely shows spinal stenosis, substantial evidence in the record supports the conclusion it has not resulted in an inability to ambulate effectively. Accordingly, Plaintiff cannot prove her impairment meets the criteria of paragraph C.

Because the record shows none of the paragraph A, B, or C criteria are met, there is substantial evidence in the record supporting the conclusion that Plaintiff's impairments do not meet

18

or medically equal Listing 1.04. As such, the ALJ's conclusion on the issue must stand.

Medical Expert Testimony

Plaintiff argues the ALJ should have compelled the testimony of a medical expert to testify as to whether Plaintiff's impairments meet a listing. (Doc. 8, at 11). Without citation, Plaintiff states "a medical expert is required when his or her presence will assist the parties." (Doc. 8, at 10). This is simply incorrect.

The "ALJ has the ultimate responsibility for ensuring that every claimant receives a full and fair hearing", but "[h]ow much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009) (quoting *Lashley v. Sec'y of* H.H.S., 708 F.2d 1048, 1051 (6th Cir. 1983); *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993)). The decision to solicit medical expert testimony is well within the discretion of the ALJ. The Sixth Circuit has noted, "20 C.F.R. §§ 404.1527(f)(2)(iii) and 416.927(f)(2)(iii) provide discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony, stating that ALJs 'may . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairments.'" *Simpson*, 344 F. App'x at 189. Furthermore, judicial review of the decision to not solicit medical expert testimony hinges on whether the testimony was necessary, not on whether it would have been merely helpful. *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (holding the "full inquiry" described by 20 C.F.R. § 416.444 only requires a consultative examination when it is *necessary* to enable the ALJ to make the disability decision).

Here, the ALJ did not abuse his discretion by not soliciting the testimony of a medical expert. No medical expert testimony was necessary to determine whether Plaintiff's impairment meets or

equals Listing 1.04 because (1) Plaintiff's treating sources clearly indicated no motor, sensory, or reflex loss, as well as only negative straight-leg raising tests, thus ruling out the paragraph A criteria; (2) absolutely no evidence in the record suggests spinal arachnoiditis or dysesthesia, and Plaintiff has not argued as much, thereby precluding the paragraph B criteria; and (3) Plaintiff's treating physician records as well as consultant RFC assessments all agreed she does not have an extreme limitation on her ability to walk, precluding the paragraph C criteria. Because medical expert testimony was not necessary, the ALJ acted soundly within his discretion by not calling a medical expert to testify.

Hypothetical RFC Questions

Plaintiff argues the ALJ erred by not propounding hypothetical questions to the VE about Plaintiff's RFC. ALJs commonly pose hypothetical questions to VEs in order to determine whether a claimant's RFC allows them to work in jobs available in the economy. This is typically done to meet the Commissioner's burden under Step Five of the disability analysis. But here, the ALJ determined Plaintiff was able to perform her past relevant work as a bench assembler. (Tr. 15). Because this ends the Commissioner's disability analysis at Step Four, no testimony from the VE about other jobs Plaintiff could perform was necessary.

Hypotheticals may be necessary for the Commissioner to meet his burden under Step Five, but under the regulations, Step Five is not reached when a plaintiff cannot meet her burden at Step Four:

> The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional

20

> capacity and your relevant work. If you can still do your past relevant work, we will
> find that you are not disabled.

20 C.F.R. § 404.1520(a)(4). That is, when a plaintiff is capable of performing her past relevant work,

the Commissioner need not prove she is incapable of performing other jobs in the economy in order

to make a finding of not disabled.

The determination that Plaintiff's RFC allows for light work is supported by substantial

evidence in the record. The regulations provide as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even though the weight lifted may be
> very little, a job is in this category when it requires a good deal of walking or
> standing, or when it involves sitting most of the time with some pushing and pulling
> of arm or leg controls. To be considered capable of performing a full or wide range
> of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). In this case, Dr. Freihofner determined Plaintiff could lift 25 pounds

frequently and 50 pounds occasionally, saying her allegations were minimally credible because the

"clinical and objective findings are minimal." (Tr. 233, 237). He also determined Plaintiff could sit,

stand, or walk a total of six hours in an eight-hour workday, with no limitations in her ability to push

or pull (including operation of hand or foot controls). (Tr. 233). It is evident from Dr. Freihofner's

report that he thoroughly reviewed Plaintiff's treating source records before making these

conclusions. (Tr. 239). Dr. Caldwell later affirmed his assessment. (Tr. 304). X-rays and an MRI of

Plaintiff's knees were normal, showing no significant arthritic changes (Tr. 171), and Dr. Hsia's

examination showed Plaintiff has a functional range of motion in her legs. (Tr. 248). No medical

records suggest Plaintiff could not carry or lift 20 pounds, and Plaintiff even testified she could

"maybe" lift ten pounds. (Tr. 42). In all, substantial evidence in the record supports the finding of

an RFC that allows for light work.

The syllogism at work here is simple. Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's RFC allows for light work, as detailed above. The VE testified Plaintiff's past relevant work was light work. (Tr. 32). Therefore, the ALJ was justified in finding Plaintiff not disabled because she could still perform her past relevant work. Accordingly, the disability analysis correctly ended at Step Four, without moving on to Step Five and using hypothetical questions to determine other jobs in the economy Plaintiff could still perform.

Plaintiff misguidedly cites *Benton v. Commissioner of Soc. Sec.*, 511 F. Supp. 2d 842 (E.D. Mich. 2007), and *Stevens v. Commissioner of Soc. Sec.*, 484 F. Supp. 2d 662 (E.D. Mich. 2007), to argue courts remand where there is a failure to propound hypothetical questions. Both *Benton* and *Stevens* were cases where the ALJ asked the VE a hypothetical question while leaving out an important limitation. *Benton*, 511 F. Supp. 2d at 849; *Stevens*, 484 F. Supp. 2d at 669. In such a situation, where an incorrect RFC has been assumed by the VE, the VE's answer obviously cannot be relied upon to provide accurate testimony on jobs the claimant could still perform. But Plaintiff's reliance on these cases misses the point. Such hypothetical questions are unnecessary if the analysis ends at Step Four, because they serve to suggest only jobs in the economy other than a claimant's past relevant work the individual could still perform. Cases like *Benton* and *Stevens*, which deal with Step Five analysis, are completely irrelevant when the claimant can still perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4). Because the ALJ properly ended his analysis at Step Four, there was no need to pose a hypothetical question to the VE.

Medical-Vocational Guidelines

Finally, Plaintiff argues that if she had been successful in establishing an inability to perform her past relevant work, the ALJ would have had to consider the Medical-Vocational Guidelines and

grid her out as disabled under Rule 202.06 or Rule 201.06. However, this argument is irrelevant in this case. The Guidelines (found in 20 C.F.R. 404, Subpt. P, App. 2) are only used to evaluate an individual's "ability to engage in substantial gainful activity in other than his or her vocationally relevant past work." 20 C.F.R. 404, Subpt. P, App. 2, § 200.00. As explained above, the ALJ's conclusion that Plaintiff remains capable of performing her past relevant work is supported by substantial evidence. Therefore, the Guidelines are not applicable.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court finds the Commissioner's decision denying DIB supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).